IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CASSANDRA A. ANTHONY,                  §
                                       §
        Plaintiff,                     §
                                       §
v.                                     §   Civil Action No. H-13-405
                                       §
CAROLYN COLVIN, ACTING                 §
COMMISSIONER OF SOCIAL                 §
SECURITY ADMINISTRATION,[1]            §
                                       §
        Defendant.                     §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[2] is Plaintiff's Motion for Summary Judgment (Doc. 11), Defendant's Cross-Motion for Summary Judgment (Doc. 9) and the responses filed thereto.  The court has considered the motions, the responses, the administrative record, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Defendant's Cross-Motion for Summary Judgment be **GRANTED** and that Plaintiff's Cross-Motion for Summary Judgment be **DENIED**.

## I.  Procedural History

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405 (g)

---

[1]    Michael Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position.  Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant.  See Fed. R. Civ. P. 25(d).

[2]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 5.

and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income benefits under Title XVI of the Social Security Act (the "Act").

**A.  Application to the Social Security Administration**

Plaintiff was born on October, 21, 1966, and was forty-two years old at the alleged onset of her disability.[3] She has a General Equivalency Diploma ("GED") and worked as a driver for a railroad company, a packer at a frozen food company and a home health care aide prior to August 31, 2008.[4]

On August 10, 2010, Plaintiff filed an application for a period of disability insurance benefits.[5]  In her application, Plaintiff stated she had been disabled since August 31, 2008, based on diabetes, high blood pressure and a bipolar disorder.[6]  The claim was initially denied on December 31, 2010, and Plaintiff moved for reconsideration.[7]  On November 28,  2011, a hearing was held before an administrative law judge ("ALJ").[8]

---

[3]    See Tr. of Admin. Proceedings ("Tr.") 112.

[4]    See Tr. 123-24.

[5]    See Tr. 10.

[6]    See Tr. 123.

[7]    See Tr. 58-63.

[8]    See Tr. 76.

2

### B. Medical History

#### 1. Records of J. Jesus Diaz, M.D.

Plaintiff was treated for diabetes and high blood pressure by J. Jesus Diaz, M.D., ("Dr. Diaz") from December 16, 2009, to August 14, 2010.[9] Over that nine-month period, Dr. Diaz saw Plaintiff for complaints of bronchitis and chest congestion, complaints of lower back pain, routine clinic visits for diabetes and related blood tests, refills for diabetes medication, and an order for a mammogram.[10] The records show well-managed blood glucose levels and a blood pressure that ranged from 108/69 to 142/105.[11]

#### 2. Records of G.K. Ravichandran, M.D.

Plaintiff was seen by G.K. Ravichandran, M.D., ("Dr. Ravichandran") for treatment of a bipolar disorder from May 27, 2009, to December 15, 2011.

On May 27, 2009, Plaintiff was evaluated by Dr. Ravichandran based on her medical history.[12] Plaintiff told Dr. Ravichandran that she suffered from frequent crying spells and that, when she became upset, her anger was uncontrollable.[13] She also stated that she had difficulty sleeping at night and was fatigued during the

---

[9]    Tr. 217-30.

[10]    Id.

[11]    Tr. 222, 226.

[12]    Tr. 201.   The medical record does not reflect any psychological testing.

[13]    Id.

3

day.[14]  Plaintiff reported anxiety and panic attacks several times a week, feelings of depersonalization, dizziness, excessive muscular tension and shortness of breath.[15]  Plaintiff related that she was very sensitive, sad, and unable to express herself.[16]

Dr. Ravichandran found that Plaintiff had mood swings, normal thought processes, intact thought association, insight, recent and remote memory, was oriented to time, place, person and situation, and had good attention and concentration.[17]  Dr. Ravichandran diagnosed Plaintiff as suffering from "Bipolar 1, Most Recent Episode Depressed Severe," and "Obsessive Compulsive Disorder" ("OCD").[18]  Based on these diagnoses, Plaintiff was prescribed Xanax for severe anxiety and Symbyax for depression.[19]

On June 9, 2009, Plaintiff returned to Dr. Ravichandran for blood tests.[20]  The record noted that all test results were within normal ranges.[21]  A June 10, 2009 clinic record reflected that a magnetic resonance imaging ("MRI") found mild areas of decreased activity in the region of the left caudate nucleus and basal

---

[14]    Id.

[15]    Id.

[16]    Id.

[17]    Id.

[18]    Tr. 202.

[19]    Id.

[20]    Tr. 203.

[21]    Id.

ganglia.[22]   The rest of the image was unremarkable.[23]

On June 26, 2009, Plaintiff returned to Dr. Ravichandran.[24] Plaintiff reported that her anxiety was stable when she took her medication, that her mood swings were "on and off," and that she was not sleeping or eating well.[25] Dr. Ravichandran noted, "Therapy is improving her severe depression and self-esteem.  Continue same treatment plan.   Progress seen with combination of Celexa, Citalopram and Symbyax."[26]

On July 31, 2009, Dr. Ravichandran's notes stated, "Depression: Moderate, OCD: Better, Drugs: None.  Medications working good, less depressed, less agitated, sleeping well at night."[27]

Plaintiff's next appointment was on November 2, 2009.  Dr. Ravichandran recorded, "Mood swings are a little better than last moth [sic]. OCD is okay taking less Xanax."[28]  The record also stated that Plaintiff was practicing relaxation exercises but that she was still non-compliant with "OAC."[29]

---

[22]    Tr. 204.

[23]    Id.

[24]    Tr. 205.

[25]    Id.

[26]    Id.

[27]    Tr. 206.

[28]    Tr. 207.

[29]    Id.  There is no explanation for this abbreviation.

On December 9, 2009, Dr. Ravichandran's notes reflected that Plaintiff's urine tested positive for phencyclidine ("PCP"), and that Plaintiff's mood and anxiety levels were "bad."[30]  Plaintiff was admitted to West Oaks Hospital for acute agitation due to bipolar disorder and drug abuse.[31]

One month later, on January 6, 2010, Dr. Ravichandran characterized Plaintiff's depression as "bad" and her OCD as "moderate."  He noted that Plaintiff reported feeling depressed, sad, anxious and nervous and that she was unable to sleep well at night or rest or relax.[32]  A notation stated, "01/18/10 – patient document sent to SSI for review for disability.  This patient continues to remain totally disabled."[33]

On February 5, 2010, Dr. Ravichandran briefly noted, "Anxiety: Better;  Mood: Bad;  OCD: Bad."[34]  He reduced her Xanax dosage to once per day.[35]  A blood test on February 24, 2010, showed a glucose level of 124.[36]

On March 5, 2010, Plaintiff returned to the clinic.  Dr.

---

[30]   Tr. 208.

[31]   Id.  The administrative record does not contain records of this hospitalization.

[32]   Tr. 209.

[33]   Id.  This notation was to be repeated on all subsequent patient records.

[34]   Tr. 210.

[35]   Id.

[36]   Tr. 211.

6

Ravichandran stated, "OCD: Moderate.   Depression: Bad.   Feels depressed, sad, not sleeping well at night.   Having some anxiety attacks."[37]   Dr. Ravichandran prescribed a sleep medication and added another medication to address symptoms of depression.[38]

On April 8, 2010, Plaintiff's condition had improved as Dr. Ravichandran characterized her condition as "moderate."[39]   One month later, on May 8, 2010, Dr. Ravichandran recorded, "Depression: Moderate.   OCD: Not Good.   Wants to get Xanax back instead of Seroquel.   She doesn't want to take Abilify anymore."[40]

On June 8, 2010, Dr. Ravichandran found Plaintiff's OCD to be "stable" and her depression, "moderate."[41]   Plaintiff reported that she was sleeping well at night, her anxiety was better and her depression was "up and down."[42]

A record of a visit dated July 7, 2010, showed a recurrence of some symptoms.[43]   Dr. Ravichandran reported that Plaintiff "feels very depressed, [is] sad, cries a lot, [is] stressed out, worries, [is] not sleeping well at night, [and is] restless."[44]   Noting

---

[37]     Tr. 212.

[38]     Id.

[39]     Tr. 213.

[40]     Tr. 214.

[41]     Tr. 215.

[42]     Id.

[43]     Tr. 216.

[44]     Id.

symptoms of psychosis, Dr. Ravichandran stated, "[s]he is unable to cope due to hallucinations and delusional (sic)."

On October 5, 2010, Dr. Ravichandran recorded, "Depression: Bad.  OCD: Not Good. . . . Feels depressed, having suicidal thoughts, hears voices, still anxious, nervous, unable to relax, mood swings out of control, easily inclined to get angry and frustrated."[45]

On January 4, 2011, Dr. Ravichandran noted that Plaintiff was "still manic depressive" and that her OCD was "worse."[46]  This is the last clinic record contained in the administrative record.

The following records were submitted to the Commissioner but not considered by the ALJ.

On February 17, 2011, Dr. Ravichandran recorded, "Bipolar Disorder: Worse; OCD: Still Present."[47]  One month later, on March 14, 2011, an improvement was noted.  Dr. Ravichandran quoted Plaintiff as stating, "My mood swings are under control.  I am sleeping somewhat better.  I like to watch TV."[48]  Dr. Ravichandran noted that a brief psychiatric rating scale was performed and that Plaintiff had "positive and negative symptoms."[49]   Individual

---

[45]    Tr. 265.

[46]    Tr. 269.

[47]    Doc. 11-1, Attach. to Pl.'s Mot. for Summ. J. p. 10.

[48]    Id. p. 9.

[49]    Id.

therapy records disclosed that Plaintiff expressed many feelings of anxiety.[50]

On April 13, 2011, the clinic records continued to show improvement.  Plaintiff stated, "I am having tosses and turns. Mood swings are under control."[51]  Dr. Ravichandran noted, "OCD: Maintaining."[52]  The record stated, "The patient spoke mainly about issues involving coping with the symptoms of OCD."[53]

Continued improvement was noted again on May 10, 2011.  Clinic records stated, "Doing well with medications.  Not having so many hallucinations."[54]  It was further noted, "The patient was today given emotional support.  Outcome good and improving.  Grades are improving.  Behavior is getting better.  Medication helps the underlying ADHD and behavior."[55]

On September 9, 2011, the medical records stated, "Medications are working fine.  I am sleeping well at night.  I have some good and bad days.  My anxiety is getting better.  My mood swings are under control."[56]  On a self-rating anxiety scale, Plaintiff's level

---

[50]    Id.

[51]    Id. p. 8.

[52]    Id.

[53]    Id.

[54]    Id. p. 7.

[55]    Id.

[56]    Id. p. 5.

of anxiety was in the "mild to moderate" range.[57]  The individual therapy notes stated, "Outcome good and improving during visit."[58]

On August 8, 2011, the records reflected that Plaintiff was not having "bad mood swings" and was "able to get thru her day without a panic attacks [sic]."[59]  Dr. Ravichandran noted that Plaintiff was compliant with her medications.[60]

On December 15, 2011, Plaintiff told Dr. Ravichandran, "Some days I feel depressed, tired, stressed out, without motivation.  I want to add something for depression.  Other medications are working okay.  I sleep good at night."[61]

On December 15, 2011, Dr. Ravichandran completed a Mental Residual Functional Capacity ("RFC") Questionnaire.[62]  He reported that Plaintiff suffered from a Bipolar Disorder in Axis I and a Panic Disorder in Axis II.[63]  Dr. Ravichandran also concluded that Plaintiff was "seriously limited, but not precluded" from performing a number of mental abilities and aptitudes needed to

---

[57]    Id.

[58]    Id.

[59]    Id. p. 4.

[60]    Id.

[61]    Id. p. 3.

[62]    Tr. 282.

[63]    Id.

perform unskilled, semiskilled and skilled work.[64]   He did not consider Plaintiff to be unable to meet competitive standards in any category.[65]

### C.  Other Expert Reports

On November 16, 2010, Plaintiff was seen by psychiatrist Carlin Barnes, M.D., ("Dr. Barnes") in connection with her application for disability benefits.[66]  Plaintiff reported that she had mood swings, was often depressed and was easily irritated.[67] Plaintiff also reported auditory and visual hallucinations.[68]  Dr. Barnes diagnosed Plaintiff as suffering from a Bipolar Disorder with psychotic features and assigned her a global assessment of functioning ("GAF") score of 50.[69]

A Psychiatric Review Technique form completed by Cate Miller, M.D., ("Dr. Miller") on December 10, 2010, evaluated Plaintiff for Affective Disorder 12.04.  Dr. Miller found that Plaintiff met the criteria for Bipolar Disorder with psychotic features,[70] but found that Plaintiff's resulting limitations were either mild or moderate

---

[64]     Tr. 284-85.   Dr. Ravichandran found Plaintiff to fall within the "seriously limited but not precluded" severity level in seventeen out of twenty-five categories.   Id.

[65]     Id.

[66]     Tr. 233.

[67]     Id.

[68]     Tr. 235.

[69]     Tr. 235-36.

[70]     Tr. 240.

in degree.[71]  Dr. Miller found no episodes of decompensation of an extended duration.[72]

A physical RFC assessment form was completed by Jimmy Breazeale, M.D., ("Dr. Breazeale") on December 30, 2010.[73]  Dr. Breazeale found that Plaintiff's claims of physical limitations were not supported by the medical records.[74]  He concluded that she could frequently lift twenty-five pounds and occasionally lift fifty pounds, stand and/or walk six hours in an eight-hour day, sit six hours in an eight-hour day, and perform unlimited pushing or pulling.[75]  Dr. Breazeale found no postural, manipulative, visual, communicative, or environmental limitations.[76]

**D.  Hearing**

Plaintiff, psychologist Dan Hamill ("Dr. Hamill") and vocational expert Kay Gilreath ("Gilreath") testified at the November 28, 2011 hearing.[77]

At the outset of the hearing, the ALJ expressed concern that

---

[71]    Tr. 247. Specifically, Dr. Miller found that Plaintiff had a mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. Id.

[72]    Id.

[73]    Tr. 255-62.

[74]    Tr. 260.

[75]    Tr. 256.

[76]    Tr. 257-59.

[77]    Tr. 23.

the administrative record only reflected visits to Dr. Ravichandran through January 2011.[78]  The ALJ also noted that Dr. Ravichandran failed to give an Axis II diagnosis and generally complained that Dr. Ravichandran had not properly documented his findings.[79]  The ALJ instructed Plaintiff's counsel to submit updated medical records, along with a "decent" mental status evaluation from Dr. Ravichandran.[80]

Plaintiff testified that her diabetes was not under control because she ate "a lot."[81]  Plaintiff stated that unregulated blood sugar levels had caused her to pass out "a lot of times," generating calls to emergency personnel.[82]  However, she stated that she had never been taken to the hospital as a result of a fainting episode.[83]  Plaintiff was able to shop and received assistance from her nineteen-year-old son with shopping, child care and driving.[84]

Plaintiff explained that she suffered from neuropathy in her hands, a condition that caused aching and numbness.[85]  The ALJ did not question Plaintiff about her Bipolar Disorder.

---

[78]    Tr. 26.

[79]    Tr. 27, 29.

[80]    Tr. 39.

[81]    Tr. 31.

[82]    Id.

[83]    Tr. 31-32.

[84]    Tr. 34-35.

[85]    Tr. 36.

Under examination by her attorney, Plaintiff testified that she was unable to work because of pain in her hands and forgetfulness.[86]  Plaintiff did not discuss her Bipolar Disorder. Plaintiff stated that she was unable to participate in parent-teacher conferences and occasionally helped her younger children with their homework.[87]  Parenting duties were performed, for the most part, by her oldest son.[88]

Dr. Hamill testified that he concurred that Plaintiff suffered from Bipolar I Disorder.[89]  Dr. Hamill stated that Dr. Ravichandran typically found his patients to suffer from anxiety disorders and complained that Dr. Ravichandran's records were never of any forensic utility.[90]  Dr. Hamill noted that Dr. Ravichandran failed to distinguish between Axis I and Axis III in his records.[91]

Dr. Hamill testified that his opinion of Plaintiff's mental RFC was based on Dr. Barnes's report, not Dr. Ravichandran's records.[92]  In his mental RFC worksheet, Dr. Hamill found that Plaintiff was markedly limited in the abilities to understand and

---

[86]   Tr. 52.

[87]   Tr. 53.

[88]   Id.

[89]   Tr. 40. However, on Dr. Hamill's mental RFC worksheet, he characterized Plaintiff's mental condition as a "mood disorder with some anxiety." Tr. 279.

[90]   Id.

[91]   Tr. 41.

[92]   Tr. 42.

remember detailed instructions, to carry out detailed instructions, and to interact appropriately with the general public.[93] Dr. Hamill found that Plaintiff was moderately limited in the abilities to maintain attention for extended periods of time, perform activities within a schedule, work in coordination with or in proximity to others without being distracted, make simple work-related decisions, accept instructions and respond appropriately to criticism, get along with others, and respond appropriately to changes in the work setting.[94]

Concluding, Dr. Hamill found Plaintiff's mental RFC to be limited to simple 1-2-3 step instructions with incidental interactions with the public.[95] He also determined that Plaintiff was unable to work in forced-pace, assembly-line employment.[96] Dr. Hamill conceded that hallucinations or conversations with dead relatives might be problematic in a work setting.[97]

Gilreath testified that Plaintiff's prior employment selling T-shirts was light, semi-skilled employment and her other jobs were too short-lived to consider.[98]

---

[93]  Tr. 277-78.

[94]  Id.

[95]  Tr. 45-46, 279.

[96]  Tr. 279.

[97]  Tr. 46.

[98]  Tr. 47.

The ALJ posed a hypothetical question to Gilreath about whether an individual who was: (1) limited to simple tasks; (2) able to understand, remember and carry out simple one-two-three-step instructions with only incidental interaction with the public; (3) unable to perform forced-pace, assembly-line type work; (4) unable to work at heights or with dangerous equipment, ladders, scaffolds or ropes; (5) able to walk/stand four to five hours; (6) able to sit for six hours; and (7) able to lift and carry twenty pounds occasionally and ten pounds frequently, was able to perform Plaintiff's past work.[99]  Gilreath responded that the hypothetical individual would not be able to perform Plaintiff's past work because a T-shirt vendor had more than incidental contact with the public.[100]

Gilreath identified the following unskilled, light jobs that could be performed by the hypothetical individual: office cleaner, retail marker, and facility rental clerk.[101]  Gilreath conceded that if the hypothetical individual had to miss more than two days of work per month, she would not be able to maintain competitive employment.[102]  Gilreath opined that if the hypothetical individual heard voices, laughed inappropriately, or had hallucinations, those

---

[99]    Tr. 49.

[100]   Id.

[101]   Tr. 49-50.

[102]   Tr. 50.

situations might interfere with the individual's employment, depending on how the individual reacted, and if others were around to observe the behavior.[103]

The ALJ granted Plaintiff thirty days within which to supplement the record with additional medical records.

### E. Commissioner's Decision

On January 28, 2012, the ALJ issued his decision.[104] The ALJ found that Plaintiff had not engaged in substantial gainful activity since August 11, 2010, and that she had multiple severe impairments: a mood disorder, obesity and diabetes mellitus.[105] The ALJ found that Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any of the listings of the regulations[106] (the "Listings").[107]

The ALJ noted that, based on the June 2011 revision of the endocrine disorder Listings, most endocrine disorders, such as diabetes, would no longer meet Listing-level severity.[108] Because there was no evidence in the record that Plaintiff's diabetes had resulted in end-organ damage, Plaintiff's diabetes did not meet the

---

[103]    Tr. 51.

[104]    Tr. 10-17.

[105]    Tr. 12.

[106]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[107]    See Tr. 51.

[108]    Tr. 13.

Listing's threshold severity level.[109]

The ALJ next found that Plaintiff's obesity did not impose additional limitations that would meet or equal a Listing.[110]

Turning to Plaintiff's claim of a mental disability, the ALJ found that her impairments did not meet or equal Listing 12.04, Affective Disorders, because the record did not support a "paragraph B" finding that at there were at least two "marked" limitations or one "marked" limitation and "repeated episodes of decompensation."[111]   The ALJ found no evidence that "paragraph C" criteria had been met.[112]

The ALJ found that Plaintiff had no relevant past work but had the RFC to perform less than the full range of light work.[113]   The ALJ determined that Plaintiff was able to lift/carry twenty pounds occasionally and ten pounds frequently, sit for six hours in an eight-hour work day, and stand/walk for six hours in an eight-hour work day.[114]   The ALJ stated that Plaintiff could not perform forced-pace assembly line work but could follow simple 1-2-3 step instructions.[115]   Plaintiff's employment was further limited to

---

[109]   Id.

[110]   Id.

[111]   Tr. 14.

[112]   Id.

[113]   Id.

[114]   Id.

[115]   Id.

having only incidental interaction with the general public and no work at dangerous heights, using ladders or around moving machinery.[116]

Plaintiff appealed, and the Appeals Council affirmed the ALJ's decision on December 11, 2012.[117]  The Appeals Council's decision became the final decision of the Commissioner.[118]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

### A. <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the burden of proving she is disabled within the meaning of the Act. <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u>

---

[116]  <u>Id.</u>

[117]  <u>See</u> Tr. 1-3.

[118]  42 U.S.C. § 405(g).

19

Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).   The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who was working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920.  By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999).  If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in

the process upon a finding that the claimant is disabled or not disabled.  <u>Greenspan</u>, 38 F.3d at 236.

## B. **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." <u>Id.</u>  The Commissioner has the responsibility of deciding any conflict in the evidence. <u>Id.</u>  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide issues de novo, or substitute the court's judgment for the Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

### A. Plaintiff's Motion for Summary Judgment

Plaintiff asserts that the ALJ's decision contains one error, which is that the ALJ failed to consider all of the evidence.[119] Plaintiff's argument is straightforward:  The ALJ granted Plaintiff thirty days within which to submit additional medical records; Plaintiff submitted those records in a timely fashion, and the ALJ failed to consider them.[120]   Plaintiff seeks a remand to the Commissioner for full consideration of the supplemental medical records.

The ALJ "has a duty to fully and fairly develop the facts relative to a claim for disability benefits." Carey, 230 F.3d at 142.  Here, recognizing that Plaintiff's medical records from Dr. Ravichandran were not up-to-date, the ALJ allowed Plaintiff to supplement the administrative record with the most current information.  Plaintiff complied and submitted the updated medical records.  In his opinion, the ALJ stated, "The record remained open for thirty days in order for the claimant to submit medical records.  However, no additional information was submitted for consideration."[121]

Defendant does not dispute that it received the supplemental

---

[119]   See Doc. 11, Pl.'s Mot. for Summ. J. p. 2.

[120]   These records are attached to Plaintiff's motion for summary judgment and bear a time-stamp showing receipt by the Social Security Administration on December 21, 2011.  See Doc. 11-1, Attach. to Pl.'s Mot. for Summ. J. p. 1.

[121]   Tr. 10.

records and that the ALJ failed to consider them.  Defendant asks the court to review the additional records and determine that consideration of those records would not have changed the ultimate determination that Plaintiff was not disabled by the ALJ.

A court may remand an action to the Commissioner when new evidence becomes available and "there is a reasonable probability that the new evidence would change the outcome of the decision." Joubert v. Astrue, 287 F. App'x 380, 383 (5th Cir. 2008)(unpublished)(quoting Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995)).

Here, it is abundantly clear that the supplemental records would not have changed the outcome of the Commissioner's decision. As outlined above, the records uniformly showed monthly improvement in Plaintiff's mental condition and a lessening of debilitating symptoms.[122]  Heeding the Fifth Circuit's caution that a court should not vacate the Commissioner's decision unless the substantial rights of a party have been affected, the court concludes that a remand on this issue would produce the same result and unnecessarily consume time and resources.  See Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)(stating that "[p]rocedural perfection in administrative proceedings is not required" as long

---

[122]    As examples:  "My mood swings are under control," (Feb. 17, 2011); "Mood swings are under control," (Apr. 13, 2011); "Doing well with medications. Not having so many hallucinations," (May 10, 2011); "Medications are working fine," "My anxiety is getting better," "Outcome good and improving during visit," (Sept. 9, 2011).

23

as the "substantial rights of a party have not been affected."). Plaintiff's motion for summary judgment should be **DENIED**.

### B. Defendant's Motion for Summary Judgment

Defendant asserts in his motion that the ALJ's decision should be affirmed because the ALJ properly determined that Plaintiff was never under a disability.

The court recognizes the seriousness of Plaintiff's medical conditions. However, the court must review the record with an eye toward determining only whether the ALJ's decision is supported by more than a scintilla of evidence. See Carey, 230 F.3d at 135. The court finds more than a scintilla of evidence in support of the ALJ's decision. Therefore, the court cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes. See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991).

For the reasons stated above, the court finds that the Commissioner has satisfied her burden. As a result, the ALJ's decision finding Plaintiff to be not disabled is supported by substantial record evidence and the court should grant Defendant's motion for summary judgment.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's Cross-Motion for Summary Judgment be **DENIED** and that Defendant's

24

Cross-Motion for Summary Judgment be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have ten days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 26th day of March, 2014.

Nancy K. Johnson
United States Magistrate Judge